# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John W. Darrah | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 2894 | **DATE** | 3/7/2002 |
| **CASE TITLE** | ROY SMITH vs. AT & T BROADBAND NETWORK COLUTIONS | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   Enter Memorandum Opinion And Order.  Defendant's motion for summary judgment is granted.  Jury trial set for March 11, 2002 is stricken.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | **Document Number** |
| | No notices required. | | | |
| | Notices mailed by judge's staff. | | MAR 0 8 2002 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | | **39** |
| ✓ | Mail AO 450 form. | U.S. DISTRICT COURT | docketing deputy initials | |
| | Copy to judge/magistrate judge. | CLERK | MAR 0 8 2002 | |
| | | 02 MAR -7 PM 4: 15 | date mailed notice | |
| LG | courtroom deputy's initials | Date/time received in central Clerk's Office | mailing deputy initials | |

# UNITED STATES DISTRICT COURT,
## NORTHERN DISTRICT OF ILLINOIS,
### EASTERN DIVISION

|                                                              |     |                                          |
| ------------------------------------------------------------ | --- | ---------------------------------------- |
| ROY SMITH,                                                   | )   |                                          |
|                                                              | )   |                                          |
| **Plaintiff,**                                              | )   | **Case No.  01 C 2894**                 |
|                                                              | )   |                                          |
| **v.**                                                      | )   | **The Honorable John W. Darrah**        |
|                                                              | )   |                                          |
| **AT&T BROADBAND NETWORK**                                  | )   |                                          |
| **SOLUTIONS, INC., a/k/a TCI of**                           | )   |                                          |
| **ILLINOIS, INC.,**                                         | )   |                                          |
|                                                              | )   |                                          |
| **Defendant.**                                              | )   |                                          |
|                                                              | )   |                                          |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Roy Smith, filed a five-count complaint against Defendant, AT&T Broadband

Network Solutions, Inc., alleging (1) violations of the Americans with Disabilities Act ("ADA"), 42

U.S.C. § 12101 *et seq.*; (2) the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621;

(3) the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601; (4) the Consolidated Omnibus

Budget Reconciliation Act ("COBRA"), 29 U.S.C. 1161 *et seq.*; and (5) a state law claim for

intentional infliction of emotional distress. Defendant moved for summary judgment, pursuant to

Federal Rule of Civil Procedure 56.

For the reasons that follow, Defendant's Motion for Summary Judgment is granted.

## LEGAL STANDARD

Summary judgment is appropriate when there remains no genuine issue of material fact and

the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Cincinnati Ins. Co.*

*v. Flanders Elec. Motor Serv., Inc.*, 40 F.3d 146, 150 (7th Cir. 1994). "One of the principal purposes

of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Thus, although the moving party on a motion for summary judgment is responsible for demonstrating to the court why there is no genuine issue of material fact, the non-moving party must go beyond the face of the pleadings, affidavits, depositions, answers to interrogatories, and admissions on file to demonstrate through specific evidence that there remains a genuine issue of material fact and show that a rational jury could return a verdict in the non-moving party's favor. *Celotex*, 477 U.S. at 322-27; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254-56 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 923 (7th Cir. 1994).

Disputed facts are material when they might affect the outcome of the suit. *First Ind. Bank v. Baker*, 957 F.2d 506, 507-08 (7th Cir. 1992). When reviewing a motion for summary judgment, a court must view all inferences to be drawn from the facts in the light most favorable to the opposing party. *Anderson*, 477 U.S. at 247-48; *Popovits v. Circuit City Stores, Inc.*, 185 F.3d 726, 731 (7th Cir. 1999). However, a metaphysical doubt will not suffice. *Matsushita*, 475 U.S. at 586. If the evidence is merely colorable or is not significantly probative or is no more than a scintilla, summary judgment may be granted. *Anderson*, 477 U.S. at 249-250.

## BACKGROUND

The undisputed facts taken from the parties' Local Rule 56.1(a) & (b) statements of material facts (referred to herein as "Pl.'s 56.1" and "Def.'s 56.1") and exhibits are as follows.

In May 1990, Plaintiff began working for Defendant as an installer. (Def.'s 56.1 ¶ 3.) Plaintiff worked at Defendant's 721 E. 112th Street facility in Chicago, Illinois, from May 9, 1990 until January 15, 1999. (Def.'s 56.1 ¶ 4.) Plaintiff was promoted to technical supervisor in 1993.

(Pl.'s 56.1 ¶ 9.)

Until March 2000, Defendant was ninety percent owned by various subsidiaries of Tele-Communications, Inc ("TCI"). (Def.'s 56.1 ¶ 80.) Defendant maintained the name "South Chicago Cable, Inc." as part of the franchise agreement. (Def.'s 56.1 ¶ 80.) Defendant was, for all employment purposes, the same company as TCI. (Def.'s 56.1 ¶ 80.) As of March 2000, 100% of the shares of Defendant were purchased by AT&T Broadband, LLC. (Def.'s 56.1 ¶ 80.)

A 1996 Supervisory Performance Appraisal ("1996 Appraisal") indicated that Smith was performing in all functional areas in a "productive" or "highly effective" manner and stated that Plaintiff could have a successful career if he applied himself. (Pl.'s 56.1 ¶ 11.) In February 1998, Plaintiff received an annual merit pay increase, which was approved by David Day. (Def.'s 56.1 ¶ 8.) On July 16, 1998, Plaintiff was awarded a "Certificate of Achievement" for successfully completing a leadership and supervisory training program. (Pl.'s 56.1 ¶ 11.)

David Day ("Day") was born on December 9, 1952. (Def.'s 56.1 ¶ 4.) Day was the General Manager of the facility from September 1997 until March 1, 2000. (Def.'s 56.1 ¶¶ 4, 9.) Day reported to Steven White ("White"), Regional Vice President for the Chicago region. (Def.'s 56.1 ¶ 9.) As a general manager, Day was responsible for ensuring optimum customer satisfaction, system profitability and smooth operation of the cable system under his management. (Def.'s 56.1 ¶ 9.)

From sometime in 1997 to January 15, 1999, Plaintiff worked as a service technical supervisor, supervising technicians who repaired technical problems. (Def.'s 56.1 ¶ 5.) In the summer of 1998, Day promoted Leonard Spearman ("Spearman") to Technical Operations Manager at the 112th Street facility. (Def.'s 56.1 ¶¶ 6, 10.) From that time, Plaintiff reported directly to

Spearman, who, in turn, reported to Day. (Def.'s 56.1 ¶ 6.) Spearman was Technical Operations Manager until June 1999. (Def.'s 56.1 ¶ 10.)

Spearman testified that he felt Plaintiff did a good job, was a good supervisor, and that Plaintiff's team had been commended by customers. (Pl.'s 56.1 ¶ 13.)

In an October 15, 1997 e-mail to White, Day noted that Plaintiff did not fit into Day's future plans for Area 5. (Def.'s 56.1 ¶ 7.) This assessment was based on Plaintiff's apparently poor record keeping and administration, such as the lack of attendance records and employee appraisals in his supervisory files. (Def.'s 56.1 ¶ 7.) Plaintiff has admitted that he has no evidence that Day had a discriminatory motive in making this statement. (Def.'s 56.1 ¶ 7.)

In 1997, Day commented to a systems technician that cable television is a "job better suited for young individuals." (Pl.'s 56.1 ¶ 18.)

On June 21, 1999, Day gave Spearman a performance plan to address and correct Spearman's performance deficiencies and gave him the option to accept the plan or resign his employment. (Def.'s 56.1 ¶ 10.) One of the issues identified by Day in Spearman's performance plan was Spearman's "[f]ailure to keep confidential, information pertaining to office personnel issues including our private conversations." (Def.'s 56.1 ¶ 10.) On or around June 21, 1999, Spearman voluntarily resigned his employment and accepted several months' continued pay and benefits as "severance". (Def.'s 56.1 ¶ 10.)

During the relevant time period, Margaret King ("King") was employed by Defendant as Human Resources Director. (Def.'s 56.1 ¶ 11.) Denise Davis ("Davis") was employed by Defendant as an Employee Relations ("Human Resources") Generalist II from February 1999 through February 2001. (Def.'s 56.1 ¶ 12.) Traci Barnes ("Barnes") has been employed by Defendant as a Technical

Administrative Assistant since July 1996. (Def.'s 56.1 ¶ 13.)

Defendant maintains an Equal Employment Opportunity Policy within its Employee

Handbook ("the Handbook") which states that:

> We are committed to the principle of equal employment opportunity and do not discriminate against or allow the harassment of any employee or applicant because of race, color, religion, gender, national origin, age, disability, veteran status, sexual orientation or other status protected by applicable federal, state, or local law. . . .

> To comply with applicable laws ensuring equal employment opportunities to qualified individuals with disabilities, the Company also will make reasonable accommodations for the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or an employee unless undue hardship would occur. Any applicant or employee who requires an accommodation in order to perform the essential functions of the job should contact his/her supervisor and request such an accommodation. The qualified individual with the disability should specify what accommodation he or she needs to perform the job. The Company may conduct an analysis to identify the barriers that make it difficult for the applicant or employee to have an equal opportunity to perform his or her job. The Company will identify possible accommodations, if any, that will help eliminate the limitation. If the accommodation is reasonable and will not impose undue hardship, the Company will make the accommodation. It is the responsibility of each employee to cooperate fully with the Equal Employment Opportunity Policy and help to ensure that his or her work environment is free of discrimination and harassment.

> To ensure compliance with the Equal Employment Policy, the Company maintains an Open Door Policy for the reporting of possible discrimination and harassment claims.

(Def.'s 56.1 ¶ 14.) Defendant's Open Door Policy contained within the Handbook states, in relevant

part, that:

> An employee who (a) has reason to believe that he or she has been discriminated against, harassed, and/or retaliated against . . . or (d) feels that there are issues that need to be addressed, is encouraged to discuss these concerns within the Company in the following manner:
> 1.     Bring the matter to the attention of your immediate supervisor and/or department head, whichever is appropriate.
> 2.     If the matter cannot be discussed with your supervisor or department

head or if you are not satisfied with the response, contact the level of management above your supervisor or department head (e.g. System Manager).

3.     If the matter cannot be discussed with management above your supervisor or if you are not satisfied with the response, contact your Employee Relations representative (field or Corporate, whichever is applicable).

(Def.'s 56.1 ¶ 15.)

The Handbook also contains a "Conflicts of Interests" policy, which states, in relevant part,

that:

You must avoid circumstances in which your personal interests are, or are likely to be, in conflict with the interests of TCI. Even when no actual conflict exists, the appearance of a conflict of interest should be avoided. If you have any reason to believe that a conflict of interest has occurred or may occur, you must bring the situation to the attention of your Supervisor and the Office of General Counsel.

(Def.'s 56.1 ¶ 16.)

The Handbook also contains an "Employee Interests in Vendors, Customers, Competitors

or Investments" policy that states, in relevant part, that:

You may not have a direct or indirect interest in or relationship with a Vendor, Customer, Competitor or TCI Investment Company that (i) affects the objectivity and independence of your judgment or conduct in carrying out your duties and responsibilities to the Company, or (ii) that may reasonably be construed by others to have such affect [sic] or the appearance of a conflict of interest. Hence, without disclosure to your Supervisor and the Office of General Counsel, and prior approval to the Ethics Committee, you shall not: . . . serve as an employee, officer, director, representative, or agent of, partner in, or consultant to, any Vendor, Customer, Competitor or TCI Investment Company.

(Def.'s 56.1 ¶ 17.) The Handbook defines "vendor" as:

any individual or entity that has, or (that you know) is contemplating, a business relationship with TCI, including, without limitation, those vendors, contractors, suppliers, programmers and others providing services, programming and materials to the Company and its financial institutions, advisors, consultants and other similar

individuals and entities. The term Vendor also includes any employee, agent or anyone acting on behalf of a Vendor.

(Def.'s 56.1 ¶ 17.)

The Handbook is distributed to each employee. (Def.'s 56.1 ¶ 18.) On January 29, 1998, Plaintiff signed an acknowledgment which stated that by signing the page, he understood that it was his "responsibility to read and familiarize [himself] with the provisions of the . . . Handbook and to abide by the guidelines set forth in the . . . Handbook." (Def.'s 56.1 ¶ 19.) Plaintiff was aware of Defendant's policy on reporting allegations of discrimination. (Def.'s 56.1 ¶ 20.)

From August 21 to November 21, 1997, Plaintiff was absent on medical leave for foot surgery for the removal of growths from his feet. (Def.'s 56.1 ¶ 21.) Plaintiff returned to work in December 1997. (Pl.'s 56.1 ¶ 6.) Plaintiff testified that, on or around December 16, 1998, he submitted a medical note from Dr. David L. Kaiser, dated December 15, 1998, to Barnes, an administrative assistant in the Human Resources department, and mailed it, along with a cover letter, to the Human Resources department. (Def.'s 56.1 ¶¶ 22, 23.) The note stated that Plaintiff suffered from a chronic condition that was exacerbated by climbing stairs, ladders and wearing work boots. (Def.'s 56.1 ¶ 22.) The note further stated that Plaintiff should be allowed special circumstances such that he could avoid situations that promoted increased pain and to wear his Dr. Scholl's shoes. (Def.'s 56.1 ¶ 22.) Wearing Dr. Scholl's shoes tends to alleviate some of the painful symptoms associated with Plaintiff's foot condition. (Pl.'s 56.1 ¶ 7.)

Barnes has stated that Plaintiff did not provide her with this note. (Def.'s 56.1 ¶ 22.) Defendant has no record of receipt of the December 15, 1998 note or its cover letter in Plaintiff's files. (Def.'s 56.1 ¶ 23.)

Plaintiff testified that he verbally notified Day of his need to wear Dr. Scholl's shoes instead of work boots. (Def.'s 56.1 ¶ 24.) Neither Day nor Spearman recall conversing with Plaintiff about his requests for work restrictions. (Def.'s 56.1 ¶ 24.) However, Defendant did not specifically deny Plaintiff's request to wear his Dr. Scholl's shoes or refrain from climbing stairs and ladders. (Def.'s 56.1 ¶ 25.) The Occupational Safety and Health Act ("OSHA"), 29 C.F.R. § 1926.96, and Defendant's policy require the use of work boots to perform the service technical supervisor job. (Def.'s 56.1 ¶ 26.)

Plaintiff testified that, from December 1997 to April 1999, neither of his alleged impairments, a foot condition or post traumatic stress disorder ("PTSD"), prevented him from working for Defendant or anywhere else, caring for himself, or going about his daily life. (Def.'s 56.1 ¶ 28.)

Plaintiff testified that he began to see a doctor for "stress related to [his] military service" in Vietnam in December 1998. (Def.'s 56.1 ¶ 30.) Plaintiff testified that he first told Day about this stress on January 8 or 15, 1999. (Def.'s 56.1 ¶ 30.) Day denied that Plaintiff notified him of this particular stress or any other kind of stress during Plaintiff's employment. (Def.'s 56.1 ¶ 30.) Smith was not diagnosed with PTSD until March 1999. (Def.'s 56.1 ¶ 31.)

On January 4, 1999, Day and King met with Plaintiff and provided him with a performance plan. (Def.'s 56.1 ¶ 32.) Plaintiff's performance plan was the first performance plan given by Day. (Def.'s 56.1 ¶ 33.) In Plaintiff's performance plan, Day stated that, while Plaintiff had adequate skills in communicating with his subordinates, his judgment and performance in managing the overall business was unsatisfactory. (Def.'s 56.1 ¶ 34.) The performance plan indicated that Plaintiff had "issues of integrity, dependability, employee development and ability to work effectively with

peers and Managers." (Def.'s 56.1 ¶ 34.)

The performance plan also stated that managers, peers and associates in Chicago South and other departments had observed Plaintiff engaging in the following behavior, which were termed "serious issues": (1) riding with technicians not assigned to him; (2) reporting to work after his regularly scheduled time; (3) going to breakfast with a technician after reporting to work; (4) driving a company vehicle home without permission during the week of December 7th; (5) establishing a pattern of refusing to run routes by leaving work in the beginning of the day or calling in sick when supervisors are being assigned routes; (6) failing to ride with technicians and providing quality control documentation for the months of November and December; (7) failing to monitor technician daily progress as witnessed by jobs being brought back without Plaintiff's knowledge; (8) frequently being unavailable to technicians, Force Administration, and Dispatch by radio; (9) failing to respond in a timely manner, or at all, to pages from managers, Force Administration, and Dispatch; (10) failing to identify and communicate gross over-billing and general ineptitude of Telecrafters after agreeing to oversee them; (11) failing to remain on site until all assigned technicians were "statused" and checked-in; and (12) failing to support management team as evidenced by his "verbal bashing" of his peers and managers. (Def.'s 56.1 ¶ 34.) During the January 4 meeting, Day told Plaintiff that Plaintiff could resign if he felt he could not follow the plan. (Def.'s 56.1 ¶ 35.)

In his deposition, Plaintiff admitted that he had ridden with an unassigned technician and took technicians out to breakfast. (Def.'s 56.1 ¶ 36.) Plaintiff further testified that he had no scheduled time to report to work. (Def.'s 56.1 ¶ 36.)

Spearman also testified that Plaintiff rode with unassigned technicians who were not assigned to him, reported to work after his regularly scheduled time, went to breakfast with technicians after

reporting to work, and criticized his peers and other managers. (Def.'s 56.1 ¶ 37.) Spearman also testified that he did not receive quality control documentation from Plaintiff in November or December 1998. (Def.'s 56.1 ¶ 37.) He also testified that Plaintiff may have refused to run routes by leaving work early or calling in sick and may have neglected to turn on his radio. (Def.'s 56.1 ¶ 37.)

On January 8, 1999, Plaintiff met with Day and informed Day that he did not like the plan and wanted to discuss his options. (Def.'s 56.1 ¶ 39.) Day told Plaintiff that he could resign and that he would be given three months' continued pay and benefits as "severance". (Def.'s 56.1 ¶ 39.) At this meeting, Plaintiff talked with Day about returning to school. (Def.'s 56.1 ¶ 44.) Day believes that Plaintiff agreed to his arrangement and resigned at that time. (Def.'s 56.1 ¶ 40.) Plaintiff believes that he was involuntarily terminated four months later on April 19, 1999. (Def.'s 56.1 ¶ 40.) Plaintiff continued to work for Defendant until January 15, 1999. (Def.'s 56.1 ¶ 41.)

At a supervisory meeting in January 1999, White told Plaintiff that he had heard that Plaintiff was leaving the job. (Def.'s 56.1 ¶ 43.) Day had told White that Plaintiff had resigned on or about January 8, 1999. (Def.'s 56.1 ¶ 43.)

Plaintiff told the technicians who reported to him and Spearman that Plaintiff was leaving Defendant in January 1999 because he was returning to school. (Def.'s 56.1 ¶ 44.)

On or around March 31, 1999, Plaintiff went to Barnes' office and requested a medical leave. (Def.'s 56.1 ¶ 67.) Plaintiff knew that Barnes did not have the authority to grant medical leave requests. (Def.'s 56.1 ¶ 67.) Plaintiff's request was strange to Barnes because she understood that Plaintiff no longer worked for Defendant. (Pl.'s 56.1 ¶ 43.) On or around March 31, 1999, Day spoke with Plaintiff about his request. (Def.'s 56.1 ¶ 67.) Day told Plaintiff that he did not

understand Plaintiff's request since Plaintiff had resigned his employment on January 8, 1999 and was no longer employed by Defendant. (Def.'s 56.1 ¶ 67.) Day may have asked Plaintiff to put the request in writing. (Def.'s 56.1 ¶ 67.)

On April 5, 1999, Plaintiff sent a letter to Day and King, requesting medical leave for his "planned surgery" during the week of April 5, 1999. (Def.'s 56.1 ¶ 68.) He requested that Day "make known to [him] any sick time available for this purpose and or details regarding short term disability benefits that may be used for this purpose." (Def.'s 56.1 ¶ 68.) Plaintiff believes that this letter is his request for leave for his foot surgery and for hospitalization, if necessary, of his newly diagnosed PTSD. (Def.'s 56.1 ¶ 72.)

Two doctors' statements were enclosed. (Def.'s 56.1 ¶ 68.) One note was written by Dr. Kaiser and dated March 31, 1999. (Def.'s 56.1 ¶ 69.) This note stated that: "[Plaintiff] is suffering from a painful areas [sic] under weight bearing points. He is disabled by these painful areas and is undergoing surgical intervention next month April 6, 1999. He will need 8-12 weeks recovery time, please excuse his absence." (Def.'s 56.1 ¶ 69.) Another note from Dr. Kaiser, dated December 15, 1998, was purportedly enclosed with the April 5, 1999 letter but Defendant has no record of receipt of this note. (Def.'s 56.1 ¶ 70.)

The other statement was a letter dated March 22, 1999 from Dr. Kienast, who had begun treating Plaintiff in December 1998. (Def.'s 56.1 ¶ 71; Pl.'s 56.1 ¶ 3.) The letter noted that Plaintiff was under Dr. Kienast's care and stated:

> . . . for treatment of a continuing condition of post-traumatic stress disorder, stemming from his experience while serving in the U.S. Marine Corps in Vietnam from March 1966 to April 1967. Because of his persistent problems, I recommend that he be hospitalized for intensive treatment going more deeply into his traumatic stress than is possible in periodic office therapy.

(Def.'s 56.1 ¶ 71.)

On or around May 10, 1999, Denise Davis, an employee in the Human Resources Department, hand-delivered to Plaintiff a letter dated April 23, 1999. (Def.'s 56.1 ¶ 74.) The letter stated, in pertinent part, that:

> On January 8, 1999, you contacted us and advised that you did not like the direction of the company in general and Chicago south specifically and you thought that separation was the most favorable option for you. We concurred and commenced paying you from January 15, 1999 through April 19, 1999. Please find enclosed a check dated April 23, 1999. This represents our last payment to you under the agreement made January 8, 1999. We wish much success in your future endeavors.

(Def.'s 56.1 ¶ 74.)

On May 19, 1999, Plaintiff sent a letter to Davis denying that he resigned on January 8, 1999. (Def.'s 56.1 ¶ 75.) In this letter, Plaintiff stated that, at the January 8 meeting, Day asked him to remain working "long enough to make it known that [he] was returning to school." (Def.'s 56.1 ¶ 42.) Day denies that this was the case. (Def.'s 56.1 ¶ 42.) The May 19, 1999 letter also stated that Day had advised Plaintiff to be examined because Plaintiff appeared to be under a great deal of stress. (Def.'s 56.1 ¶ 45.) According to the May 19, 1999 letter, Day also advised Plaintiff that Plaintiff could be assigned special projects until Plaintiff was better. (Def.'s 56.1 ¶ 45.) In the May 19, 1999 letter, Plaintiff stated that he told Day that his stress was related to his military experience. (Def.'s 56.1 ¶ 45.) But the May 19, 1999 letter did not mention Plaintiff's alleged diagnosis of PTSD. (Def.'s 56.1 ¶ 75.)

Plaintiff claims he was confused about his employment status at that time. (Def.'s 56.1 ¶ 47.) Plaintiff believed that he had been given a leave with full pay and benefits starting January 15, 1999, and that he would be required to work only on special projects when such projects came along.

(Def.'s 56.1 ¶ 46.) Plaintiff did not know the specifics about these special projects, and Plaintiff and Day agree that Cablexpress was not mentioned as one of these special projects. (Def.'s 56.1 ¶¶ 46, 61.)

According to Plaintiff, Day did not require any medical verification for this indefinite medical leave. (Def.'s 56.1 ¶ 48.) After January 15, 1999, Plaintiff did not report to work at 721 E. 112th Street or supervise his former employees; but he did continue to collect his full wages until April 19, 1999, and to receive medical benefits until May 1, 1999. (Def.'s 56.1 ¶ 50.) From January 15, 1999 until sometime in February 1999 Plaintiff did not work for Defendant or anyone else. (Def.'s 56.1 ¶ 53.)

Contrary to Plaintiff's assertion, Day denied that he and Plaintiff talked about Plaintiff's stress or that he had knowledge of any stress relating to Plaintiff's military experience. (Def.'s 56.1 ¶ 49.)

After January 15, 1999, Day redistributed the employees whom Plaintiff supervised to Edmond Clemons, who was born on July 15, 1946; Louis Franks, who was born on April 15, 1941; Herbert Jackson, who was born on October 31, 1944; and Elias Mendez, who was born on April 21, 1950. (Def.'s 56.1 ¶ 52.) On April 19, 1999, Day completed paperwork indicating that Plaintiff's last day was April 19, 1999. (Def.'s 56.1 ¶ 51.) Plaintiff was born on November 14, 1947. (Def.'s 56.1 ¶ 3.)

Cablexpress, located at 8226 E. Park Meadows Drive in Littleton, Colorado, is a telecommunications company that provides construction services for the installation of fiber optics and telecommunications systems, such as cable. (Def.'s 56.1 ¶ 54.) In 1999, Cablexpress installed cable as a subcontractor for TCI Great Lakes, Inc. (Def.'s 56.1 ¶ 54.) The contract between

Defendant and Cablexpress provided that Cablexpress would not hire or use the services of, and would ensure that its subcontractors did not hire or use the services of, any employee who had worked for Defendant during the last sixty calendar days. (Def.'s 56.1 ¶ 55.) Cablexpress's policies do not permit an employee to work full-time at another employer when it had hired an employee to work full-time. (Def.'s 56.1 ¶ 63.)

Plaintiff worked for Cablexpress in February and March of 1999. (Def.'s 56.1 ¶ 56.) On Februay 22, 1999, Plaintiff applied for full-time employment with Cablexpress. (Def.'s 56.1 ¶ 56.) Plaintiff also completed a New Hire Checklist. (Def.'s 56.1 ¶ 56.) The New Hire Checklist stated that Plaintiff's "Actual Start Date" was February 23, 1999. (Def.'s 56.1 ¶ 56.)

Plaintiff also completed an "Employee Health Questionnaire" ("the questionnaire"). (Def.'s 56.1 ¶ 57.) On the questionnaire, Plaintiff answered "no" when asked whether he "ever had any medical treatment" for "other illnesses" and "depression". (Def.'s 56.1 ¶ 57.) Plaintiff answered "yes" when asked whether he suffered from painful or flat feet but did not mention any treatment for his alleged foot condition after the August 1997 foot surgery in a section for additional information on "yes" answers. (Def.'s 56.1 ¶ 57.) On the questionnaire, Plaintiff further stated that he had no conditions that might interfere with his ability to perform his job and stated no details of illnesses, injuries, operations, or conditions that might impact his ability to perform his job. (Def.'s 56.1 ¶ 57.) Plaintiff signed and dated the questionnaire on February 22, 1999. (Def.'s 56.1 ¶ 57.)

Plaintiff wore his TCI uniform on his first day at Cablexpress. (Pl.'s 56.1 ¶ 39.) On the second or third day, and everyday thereafter, Plaintiff wore a Cablexpress uniform during his employment with Cablexpress. (Def.'s 56.1 ¶ 58; Pl.'s 56.1 ¶ 39.) Plaintiff testified that his alleged medical conditions did not impair his ability to perform his job at Cablexpress. (Def.'s 56.1 ¶ 65.)

Plaintiff testified that he was paid $22 per hour for hours worked over forty hours at Cablexpress. (Def.'s 56.1 ¶ 59.) Cablexpress does not permit this type of arrangement for payment of wages. (Def.'s 56.1 ¶ 59.) If Plaintiff had worked forty hours per week at Cablexpress, he would have earned $2,640 at the stated rate of pay. (Def.'s 56.1 ¶ 59.) Plaintiff's W-2 forms from Cablexpress show that he earned $2,643 during his employment at Cablexpress. (Def.'s 56.1 ¶ 59.)

Plaintiff does not know whether the job at Cablexpress came about through Day's efforts or was one of the "special projects". (Def.'s 56.1 ¶ 62.) Day stated that he had no involvement in, or knowledge of, Plaintiff's employment with Cablexpress. (Def.'s 56.1 ¶ 62.)

The "Termination Report" ("the report") in Plaintiff's Cablexpress personnel file stated that: Plaintiff (1) was discharged on March 15, 1999, for refusing to follow instructions and for being disrespectful to a supervisor; (2) was not eligible for rehire; and (3) his last day was March 15, 1999. (Def.'s 56.1 ¶ 64.) From March 26 to May 1, 1999, Plaintiff did not report to work anywhere. (Def.'s 56.1 ¶ 66.)

William Wolfe, Director of Eligibility Services, Cigna HealthCare, sent Plaintiff a letter dated May 14, 1999, which stated that Plaintiff's health plan coverage ended on May 1, 1999. (Def.'s 56.1 ¶ 76.)

On June 22, 1999, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging that Day discriminated against him on the basis of his age and "foot disorder" by giving him a "written reprimand" in January 1999 and discharging him on April 19, 1999. (Def.'s 56.1 ¶ 78.) Plaintiff's charge also alleged that Day discriminated against him on the basis of his foot disorder by denying his request for a medical leave on or around March 30, 1999. (Def.'s 56.1 ¶ 78.) Plaintiff amended this charge on April 27, 2000, alleging that Day

discriminated against him because of his alleged PTSD by giving him a written reprimand in January 1999, denying his request for medical leave on or around March 30, 1999, and discharging him on April 19, 1999. (Def.'s 56.1 ¶ 78.)

Plaintiff served in the Marine Corps from January 1965 to August 1967. (Pl.'s 56.1 ¶ 1.) Plaintiff was sent to Vietnam in March 1966, where he saw combat through April 1967. (Pl.'s 56.1 ¶ 1.) In addition to Dr. Kienast, Plaintiff has also seen a staff psychologist at the Veterans Administration ("VA") Medical Center in North Chicago, Dr. Howard Lipke. (Pl.'s 56.1 ¶3.) Plaintiff has attended weekly, bi-weekly or monthly therapy sessions for his PTSD. (Pl.'s 56.1 ¶ 4.) In June 2000, the VA changed Plaintiff's disablement certification from thirty percent to one hundred percent. (Pl.'s 56.1 ¶ 4.)

Plaintiff describes his level of post-traumatic stress as severe. (Pl.'s 56.1 ¶ 4.) Despite periods of being unable to work, Plaintiff desires to work and considers work to be therapeutic for his PTSD. (Pl.'s 56.1 ¶ 4.)

In a list of ailments Plaintiff prepared for his previous attorney, Plaintiff did not list stress or depression. (Def.'s 56.1 ¶ 79.)

## **DISCUSSION**

Defendant has moved for summary judgment on all counts of Plaintiff's complaint.

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a) (2002).

Plaintiff has offered no direct evidence of disability discrimination. To prove an ADA

discrimination claim indirectly, Plaintiff is required to show: (1) he is disabled within the meaning of the ADA; (2) his work performance met the employer's legitimate expectations; (3) he was discharged; and (4) circumstances surrounding his discharge indicated that it was more likely than not that his disability was the reason for the adverse action. *Leffel v. Valley Financial Services*, 113 F.3d 787, 793 (7th Cir. 1997). Plaintiff's ADA claim fails because he has failed to show the first, second, and fourth elements.

A "disability" under the ADA is "a physical or mental impairment that substantially limits one or more major life activities . . . or being regarded as having such an impairment. " 42 U.S.C. § 12102(2). "Substantially limits" means "unable to perform a major life activity that the average person in the general population can perform" or "significantly restricted as to the condition, manner, or duration under which an individual can perform a . . . major life activity as compared to" the average person in the general population. 29 C.F.R. § 1630.2(j)(1). "Intermittent, episodic impairments are not disabilities[.]" *Van Zande v. State of Wisconsin Dep't of Admin.*, 44 F.3d 538, 543 (7th Cir. 1995).

Major life activities are "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(h)(2)(i). In determining whether an impairment is substantially limiting, the following factors will be considered: "(1) the nature and severity of the impairment, (2) the duration or expected duration of the impairment, and (3) the permanent or long term impact, or expected permanent or long term impact of, or resulting from, the impairment." *Hamm v. Runyon*, 51 F.3d 721, 725 (7th Cir. 1995).

Plaintiff has not shown that he is a qualified individual with a disability under the ADA. Neither his alleged foot condition nor his alleged PTSD substantially limit a major life activity.

Plaintiff testified in his deposition that neither of his alleged impairments have prevented him from working for Defendant or anywhere else, caring for himself, or going about his daily life. Moreover, Plaintiff testified that neither of his alleged conditions impaired his ability to perform his work at Cablexpress in February and March 1999. Plaintiff has not presented any evidence that his alleged impairments substantially limit any other major life activity. Therefore, there is no genuine issue of material fact as to whether Plaintiff is substantially limited in any major life activity.

Plaintiff cannot show that he was meeting Defendant's legitimate expectations. On January 4, 1999, Day and King provided Plaintiff with a performance plan which indicated the deficiencies in Plaintiff's performance. Spearman, Plaintiff's immediate supervisor, testified that he agreed with the deficiencies that were stated in Plaintiff's performance plan. Moreover, Plaintiff testified that he had, in fact, committed several of what were termed "serious issues" in the performance plan.

The fact that the 1996 Appraisal was favorable, that Plaintiff was awarded a Certificate of Achievement in 1997, or that he received a merit pay increase in February 1998 does not show that a rational jury could find that he was meeting the legitimate expectations of his employer at the relevant time. "[T]he critical issue is whether [Plaintiff] was performing well at the time of . . . termination." *Hong v. Children's Memorial Hospital*, 993 F.2d 1257, 1262 (7th Cir. 1993). "[S]o long as the employer's employment expectations are 'in good faith[,] without fraud or deceit,' . . . [a court] only determine[s] if the employee met them." *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1090 (7th Cir. 2000) (internal citation omitted).

As evidenced by the performance plan, Plaintiff was not meeting Defendant's expectations. Moreover, Plaintiff has not presented any evidence that would suggest that Defendant's expectations were unreasonable. It seems reasonable that Defendant would expect Plaintiff to show up for work

on time, not go to breakfast after reporting for work, ride with technicians who were assigned to him, provide quality control documentation, be available to co-workers by radio, etc. Furthermore, accepting a job with Cablexpress violated Defendant's Conflict of Interest policy. Thus, there is no issue of material fact as to whether Plaintiff was meeting Defendant's legitimate expectations.

Finally, Plaintiff has not shown that it was more likely than not that his disability was the reason for his termination. *Leffel,* 113 F.3d at 793. A plaintiff can demonstrate this by showing that "persons not disabled or perceived to be disabled were treated differently than plaintiff". *Leffel,* 113 F.3d at 793. After the plaintiff has established a *prima facie* case of discrimination, the "defendant must articulate a legitimate non-discriminatory reason for discharging [him]. . . . [T]he plaintiff must then establish that this proffered reason is really a pretext for discrimination." *Leffel,* 113 F.3d at 792.

However, even if Plaintiff were able to establish that he was treated differently than non-disabled employees, he cannot establish that the reasons for his separation from Defendant were pretextual. "A plaintiff can establish pretext by showing either that a discriminatory reason more likely motivated the employer or that the employer's explanation is unworthy of credence." *Debs v. Northeastern Illinois Univ.,* 153 F.3d 390, 395 (7th Cir. 1998). An honest belief in the nondiscriminatory reason offered by the decision-maker will be sufficient even if the reasons are foolish, trivial, or even baseless. *Debs,* 153 F.3d at 396.

Defendant asserts a single explanation for Plaintiff's separation from employment: Plaintiff voluntarily resigned on January 8, 1999. Plaintiff argues that this reason is pretextual because (1) there is no written record of his alleged resignation, (2) he requested medical leaves, (3) he asserted that he had never resigned, (4) he represented to Cablexpress that he was still employed by

Defendant, (5) he was continuously paid for three months after January 15, 1999, and (6) he has an overwhelming need for his medical benefits and wages.

Even if they were true, none of Plaintiff's assertions indicate that Defendant did not honestly believe that Plaintiff had voluntarily resigned on January 8, 1999. The evidence presented indicates that Plaintiff did not report to work at, or actually work for, Defendant after January 15, 1999, and that Plaintiff applied for and received full-time employment with Cablexpress in February 1999. Furthermore, Day denies that working for Cablexpress was a "special assignment"; and Plaintiff, himself, is not sure whether or not the job at Cablexpress was a "special assignment." Moreover, Plaintiff's disagreement with Day's belief concerning his resignation does not raise a genuine issue of material fact as to whether Defendant's proffered reason is pretextual. *See Gustovich v. AT&T Communications, Inc.*, 972 F.2d 845, 848 (7th Cir. 1992) ("An employee's self-serving statements about his ability, however, are insufficient to contradict an employer's negative assessment of that ability. . . . Such statements may create a material dispute about the employee's ability but do nothing to . . . establish that the proffered reason is a pretext for discrimination.").

Therefore, summary judgment is appropriate on Plaintiff's ADA claim (Count I).

Defendant argues that summary judgment on Plaintiff's age discrimination claim is appropriate because there is no evidence that Defendant considered Plaintiff's age in any of its employment decisions.

Plaintiff may prove discrimination under the ADEA through direct evidence or indirectly through the burden-shifting mechanism of *McDonnell Douglas. McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). In this case, Plaintiff has presented no direct evidence of age discrimination. Direct evidence of intentional discrimination entails proof of acknowledgment by

the Defendant of a discriminatory motive. *Troupe v. May Department Store*, 20 F.3d 821, 823 (7th Cir. 1994).

To prove discrimination indirectly, Plaintiff must establish that: (1) he is a member of a protected class; (2) he suffered an adverse employment action; (3) he was meeting his employer's legitimate performance expectations; and (4) his employer treated similarly situated employees who were not in the protected class more favorably. *Maarouf v. Walker Manufacturing Co.*, 210 F.3d 750, 751 (7th Cir. 2000). Plaintiff cannot establish the third and fourth elements.

As was discussed earlier in this opinion, Plaintiff was not meeting the legitimate expectations of his employer at the time he left Defendant. Plaintiff has not presented any evidence that Defendant treated younger workers more favorably. The employees who replaced Plaintiff, to the extent that they received assignments to supervise Plaintiff's former technicians, were all in the protected class, and two were older than Plaintiff. On January 15, 1999, Edmond Clemons was fifty-years old, Louis Franks was fifty-seven years old, Herbert Jackson was fifty-four years old, and Elias Mendez was forty-eight. Therefore, there is no genuine issue of material fact as to whether Defendant treated workers outside the protected class more favorably.

Even if Plaintiff could establish a *prima facie* case of age discrimination, Plaintiff cannot show that Defendant's reason for his departure–he voluntarily resigned–was pretextual, as was discussed above. Therefore, summary judgment on Plaintiff's age discrimination claim (Count II) is appropriate.

Defendant argues that summary judgment on Count III, which alleges Defendant violated the FMLA, is appropriate because Plaintiff could not have been discharged while on FMLA leave for foot surgery since the foot surgery occurred when Plaintiff was no longer employed by Defendant.

The FMLA prohibits employers from discriminating against an employee for exercising rights created by the Act. *Rice v. Sunrise Express, Inc.*, 209 F.3d 1008, 1017 (7th Cir. 2000). In order to make a claim that Defendant interfered with his rights under the FMLA, Plaintiff must establish that he possessed a right under the FMLA. *See Rice*, 209 F.3d at 1017. The FMLA provides that employees returning from leave under the Act are entitled to be restored to an equivalent position, with equivalent benefits, pay and other terms or conditions of employment. 29 U.S.C. § 2614(a)(1). However, employees are only entitled to the right, benefit, or position they would have been entitled to had they not taken the leave. 29 U.S.C. § 2614(a)(3).

To be qualified for leave under the FMLA, an employee must be suffering from a serious health condition. 29 C.F.R. § 825.114. Here, Defendant claims that Plaintiff was not entitled to restoration to his former position because he was no longer employed by Defendant. The last day Plaintiff worked for Defendant was January 15, 1999. At that time, Plaintiff was not on leave under the FMLA. The last time Plaintiff was on FMLA leave was from August 21 to November 21, 1997 when he had surgery to remove growths from his feet.

"An employer must be able to show that an employee would not otherwise have been employed at the time reinstatement is requested in order to deny restoration to employment" and not violate the FMLA. *Rice*, 209 F.3d at 1018 (citing 29 C.F.R. § 825.216(a)(1)). The parties dispute whether Plaintiff was on medical leave due to PTSD from the period of January 1999 until April 1999, as he contends (which is contrary to the facts discussed above), or no longer employed by Defendant due to his resignation, as Defendant contends. However, even assuming Plaintiff were on medical leave due to PTSD during that period, he would not have been entitled to an additional leave for his foot surgery. *See* 29 U.S.C. § 2612(a)(1) (employees are entitled to twelve weeks of

leave during a twelve-month period). Thus, under either Plaintiff's or Defendant's theory of the case, Defendant could not have denied Plaintiff leave in violation of the FMLA. Therefore, summary judgment on Count III is appropriate.

Defendant argues that summary judgment on Count IV is appropriate because it properly sent Plaintiff notice of his rights under COBRA.

COBRA requires group health plan sponsors to provide notice to each qualified beneficiary who, as the result of a qualifying event, such as termination, would lose coverage to elect to continue coverage. 29 U.S.C. § 1161. Count IV alleges that Defendant violated COBRA by not giving Plaintiff notice of his right to elect to continue coverage.

"Notification methods that are reasonably calculated to reach the former employee satisfy the standard good faith compliance with the statute. . . . Notice by first class mail addressed to the former employee's last known address . . . is an acceptable method of notification." *Keegan v. Bloomingdale's, Inc.*, 992 F. Supp. 974, 978 (N.D. Ill. 1998) (citations omitted). However, "[t]he plan administrator bears the burden of proving that adequate notice of COBRA rights was provided to the former employee." *Keegan*, 992 F. Supp. at 978. It must be proven that Plaintiff's notice was actually mailed. *Keegan*, 992 F. Supp. at 978.

It is undisputed that the letter dated May 14, 1999, from William Wolfe was mailed to Plaintiff. However, Plaintiff has offered only his denial that he received the additional documents that are attached to the May 14, 1999 letter. These additional documents are notices by Defendant of Plaintiff's right to continue coverage.

"[P]roof of procedures followed in the regular course of operations which give rise to a strong inference that the [notice] was properly addressed and mailed" is sufficient to establish that

the notice was actually mailed. *Keegan*, 992 F. Supp. at 978. Here, Defendant presented competent evidence that it was its regular procedure to notify Willis Corroon by electronic transmission of employees no longer on Defendant's payroll at the end of the pay period; whereupon, Corroon would send a COBRA notice to these former employees by first class U.S. mail. (Shank Decl. ¶ 4.) While Defendant does not retain copies of the notice that was mailed, a computer generated log of such notices is created at or near the time of mailing of the notice and kept in the regular course of business. (Shank Decl. ¶ 5.) Defendant has attached a copy of this log.

Plaintiff does not dispute that it was Defendant's regular course of business to follow the procedures outlined above. Plaintiff has not presented any evidence that would suggest that these procedures were not followed in his case. Thus, there is no genuine issue of material fact as to whether Plaintiff was notified of his rights under COBRA, and summary judgment is appropriate on Count IV.

Defendant argues Plaintiff's claim for intentional infliction of emotional distress (Count V) is preempted by the IHRA. Summary judgment has been granted on Plaintiff's federal claims, Counts I through IV. Therefore, the Court no longer has pendent jurisdiction over Plaintiff's state law claim for intentional infliction of emotional distress. Thus, Count V is dismissed for lack of subject matter jurisdiction.

## SUMMARY

Plaintiff does not suffer from a disability under the ADA which substantially limits a major life activity. The contrary is apparent based on his performance of all his duties while employed at Cablexpress. His employment there was during February and March of 1999, when he claims he was still employed by Defendant and on FMLA leave. Defendant's contention that Plaintiff resigned on

-24-

January 8, 1999, effective January 15, 1999, is likewise beyond factual dispute. Plaintiff no longer reported to work at Defendant and applied for full-time employment at Cablexpress.

There is no factual support that Plaintiff's age was considered in any of Defendant's employment decisions. In fact, the employees who assumed Plaintiff's responsibilities were in the protected class, and two of those employees were older than Plaintiff.

Plaintiff was not entitled to an FMLA leave because he was no longer employed by Defendant at the time of his foot surgery.

Defendant properly sent Plaintiff notice of his rights under COBRA. The evidence established that it was Defendant's procedure to send COBRA notices via first-class U.S. mail to employees who were no longer on Defendant's payroll.

Plaintiff's intentional infliction of emotional distress claim is dismissed.

## CONCLUSION

For the reasons stated herein, Defendant's Motion for Summary Judgment is granted.

**IT IS SO ORDERED.**

John W. Darrah, Judge
United States District Court

Date: *March 7, 200*